Argued and submitted February 27, 2002, affirmed October 22, 2003

# STATE OF OREGON,
*Respondent,*

*v.*

# STEVEN PETERSON,
*Appellant.*

0003-43639; A111107

79 P3d 315

Laura Frikert, Deputy Public Defender, argued the cause for appellant. With her on the brief was David E. Groom, Public Defender.

Joanna L. Jenkins, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy

Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Landau, Presiding Judge, and Brewer, Judge, and Osborne, Judge pro tempore.

OSBORNE, J. pro tempore.

## OSBORNE, J. pro tempore

Defendant appeals his convictions for resisting arrest, ORS 162.315, and harboring a runaway, *former* Portland City Code (PCC or code) 14.28.070 (1999).[1] He assigns error to the trial court's denial of his motions for judgment of acquittal with respect to each charge. We affirm.

> "We view the evidence in the light most favorable to the state to determine whether a rational trier of fact, making reasonable inferences, could have found the essential elements of the crime proved beyond a reasonable doubt. The issue is not whether we believe defendant is guilty beyond a reasonable doubt, but whether there was sufficient evidence for a jury to so find."

*State v. Hall*, 327 Or 568, 570, 966 P2d 208 (1998) (citations omitted).

At the time of the incident giving rise to the charges in this case, defendant was the stepfather of a 17-year-old female who had been found to be within the jurisdiction of the juvenile court under ORS 419B.100, who was in the legal custody of the Department of Human Services, and who had been placed in a residential program for girls in Portland. On March 16, 2000, defendant's stepdaughter had been given leave to visit with her mother, defendant's wife, from 3:00 p.m. to 6:30 p.m. at a local mall. Defendant's stepdaughter did not return to the residential facility at 6:30 p.m., but called sometime thereafter to inform staff that she had gone to her mother's house, where defendant also lived. Sometime after 7:30 p.m., Hughes, the residential program supervisor, reported the stepdaughter's absence to police. Around 9:00 p.m., Hughes spoke with defendant's stepdaughter by telephone and told her that she needed to return to the residential facility. Defendant's stepdaughter told Hughes that she wanted to stay at her mother's house and was not coming back to the facility. Both defendant and his wife testified that their plan was to return defendant's stepdaughter to the facility the next morning.

---

[1] The current code no longer includes a provision relating to harboring a runaway.

Police arrived at defendant's house shortly after 10:00 p.m., and two officers went to the front porch. The officers could see into the house through a window on the porch and saw defendant, his wife, and his stepdaughter sitting in the living room, watching television. Officer Weber knocked on the door and informed defendant that his stepdaughter was a runaway and needed to leave with them. Defendant refused to open the door, and the officers called for back up. Officer Weber informed defendant that he was under arrest for harboring a runaway, but defendant did not allow the officers to enter for approximately ten minutes. At one point, defendant stated that he was not going to open the door and that police would have to break it down.

After another officer arrived with a means to forcibly open the door,[2] defendant opened the door. Officer Weber testified that defendant then pulled up his arms into a boxing stance. Two officers grabbed defendant by the arms and took him to the front porch. Both officers testified that defendant struggled and that he reared his head at one of them, attempting to either "head butt" or bite the officer. Officer Weber placed defendant in a headlock, and eventually the two officers got defendant to the ground and handcuffed him.

Defendant was charged with resisting arrest and harboring a runaway.[3] After the state's presentation of its case-in-chief, defendant moved for a judgment of acquittal on each charge. The trial court denied the motions.

■   In his first assignment of error on appeal, defendant asserts that the state failed to prove that defendant "created a substantial risk of physical injury" as required by the definition of "resists" in ORS 162.315(2)(b). Defendant relies on *State v. Hasan*, 93 Or App 142, 144, 760 P2d 1377 (1988), which involved a 6'5", 300-pound officer and a 5'4", 102-pound female, for the proposition that defendant here was not capable of creating a substantial risk of physical

---

[2] That object was referred to in testimony as a "key" and was described as a "small battering ram."

[3] Defendant also was charged with attempted assault of a public safety officer under ORS 163.208, but the jury acquitted defendant of that charge.

injury to the police officers. We disagree. *Hasan* involved factual circumstances not present here. In this case, there is evidence that it required two officers over a minute to subdue defendant and that he attempted to bite or head butt one of the officers. That is sufficient evidence to support the jury's verdict. *See State ex rel Juv. Dept. v. Stout*, 107 Or App 233, 238, 811 P2d 660 (1991) (evidence sufficient where the child approached officer with fists raised); *State v. Hutchinson*, 94 Or App 441, 444, 444 n 2, 765 P2d 248 (1988) (evidence sufficient where the defendant was a very strong person, was difficult for the officer to control, and the officer required the assistance of another officer to subdue the defendant; distinguishing *Hasan*).

Defendant's second assignment of error challenges the denial of his motion for judgment of acquittal on the charge of harboring a runaway under *former* PCC 14.28.070. He asserts that the state failed to establish harboring, which the code defines as providing lodging, because defendant did not provide overnight accommodation to his stepdaughter. The state responds that defendant failed to preserve that argument and that, even if he did preserve it, harboring can include the provision of temporary or short-term shelter.

■ We first consider the state's contention that defendant failed to preserve the argument that he now advances. The state contends that, "[w]ith respect to the meaning of 'harbor,' defendant argued that the ordinance requires proof of hiding the child, in the sense of helping her to run away. Defendant now contends that harboring, defined as providing lodging, means provision of overnight accommodation." The state is correct that defendant failed to advance the specific argument that he makes on appeal. However, in arguing his motion to the trial court, defendant stated that there was "no evidence that anyone harbored the child" and that "a reasonable conclusion is these people did not provide [defendant's stepdaughter] shelter. [Defendant's stepdaughter] provided a shelter herself by going there and refusing to leave." By calling into question the meaning of the term "harbor" in *former* PCC 14.28.070, defendant preserved the "issue" of whether the state had established an element of the charged offense, namely, harboring. Defendant's failure to advance the particular "argument" he now asserts on appeal

is less important.[4] *State v. Hitz*, 307 Or 183, 188, 766 P2d 373 (1988); *see also State v. Smith*, 184 Or App 118, 121-22, 55 P3d 553 (2002).

Further, defendant's argument implicates the construction of an ordinance, which arguably invokes the principle established by *Stull v. Hoke*, 326 Or 72, 77, 948 P2d 722 (1997), that "[i]n construing a statute, this court is responsible for identifying the correct interpretation, whether or not asserted by the parties." More recently, the court has stated:

> "In any given instance, the court might ascertain legislative intent in light of particular arguments that counsel (1) made consistently throughout the proceedings, (2) made for the first time on appeal or review, or (3) never made at all—so long as the issue of the meaning of the statute has been preserved."

*Newport Church of the Nazarene v. Hensley*, 335 Or 1, 16, 56 P3d 386 (2002). We assume that those principles apply equally when this court is asked to construe a city ordinance. *See Lincoln Loan Co. v. City of Portland*, 317 Or 192, 199, 855 P2d 151 (1993). Accordingly, we turn to the merits.

■ In a criminal case, sufficiency of the evidence is a question of law. *State v. Harris*, 288 Or 703, 723, 609 P2d 798 (1980). Before assessing the sufficiency of the evidence presented, we must determine what the ordinance requires the state to prove in order to establish criminal liability for harboring a runaway child in contravention of the code.

*Former* PCC 14.28.070 (1999):

"It is unlawful for any person knowingly to harbor a runaway child. As used in this Section:

---

[4] We note that the trial court may have been aware of the issue and had the opportunity to decide it, an important consideration respecting preservation. After reading aloud the definition of "to harbor" in PCC 14.28.070, the court stated,

"Whether or not this was harboring in the sense of providing lodging, I think is a fact question for the jury. It's 10:15 at night, roughly, they're sitting watching TV. It's a home. * * * There is evidence that she was there for some period of time from the * * * return telephone call that she made until the time the police arrived. The jury's going to have to decide whether that is providing lodging or not, but I think there's enough evidence * * * to make it a jury question."

"A. 'To harbor' means to provide lodging, whether or not for compensation, without first notifying the Bureau of Police; and

"B. 'Knowingly' means with actual knowledge or under circumstances that would lead a person of common intelligence to believe that the child was a runaway; and

"C. 'Runaway child' means an unmarried child under 18 years of age who, without consent of the parent or other person having legal custody of that child, leaves and stays away from the home or other dwelling place provided for the child by that person."

As noted, defendant contends that, based on the plain meaning of the definition in subsection (a), harboring, which is defined as providing "lodging," requires the provision of overnight shelter. The state responds that providing lodging includes the provision of hospitality. The resolution of the parties' contentions presents a matter of statutory construction, which we resolve according to the methodology established by *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). *See Lincoln Loan*, 317 Or at 199 (holding that the same principles of construction apply to Portland City Code provisions). We first examine the text and context of the ordinance, giving words of common usage their plain, natural, and ordinary meaning. *PGE*, 317 Or at 611.

Both parties rely on portions of the dictionary definitions of the pertinent terms. Defendant primarily relies on a portion of the definition of the verb "lodge." "Lodge" has, however, several possibly relevant definitions:

"*vt* **1 a :** to provide temporary quarters for : give a place to sleep to: show hospitality to ‹there were some in which two or three hundred people . . . could without difficulty be *lodged* and fed * * *› **b :** to establish or settle in a place ‹the troops *lodged* themselves in the enemy's outworks› **c :** to serve as a habitation or shelter for ‹every house was proud to ~ a knight * * *› **d :** to rent lodgings to : ACCOMMODATE 4b [to provide lodgings for] ‹hoped they would ~ him for the winter› * * * *vi* **1 a :** to occupy a place temporarily : stay overnight: SLEEP ‹he would ~ on the cot in the spare

room upstairs * * *, **b** (1) : to have a residence: DWELL, STAY ‹~ over a bookbinder's shop[.]"[5]

*Webster's Third New Int'l Dictionary* 1329 (unabridged ed 1993) (italics and boldface in original; bracketed material added).

The state points out that *former* PCC 14.28.070(a) includes the terms "provide" and "lodging," not the term "lodge" in isolation. The relevant definitions of "lodging" are

"**1 a :** a place to live : DWELLING, HABITATION ‹high wages that go at once for ~ * * *, **b :** a place in which to settle or come to rest : LODGMENT ‹must not allow the recklessness of despair to find any ~ in our hearts * * *, **2 a** (1) : sleeping accommodations ‹itinerant schoolteacher who found board and ~ in the house of his pupils' parents * * *, (2) : a temporary place to stay ‹find a ~ for the night›."

*Webster's* at 1329. In turn, "provide" means "to fit out or fit up : EQUIP" or "to supply for use : AFFORD, YIELD." *Id.* at 1827.

We disagree with defendant that the dictionary definitions of "lodge" and "lodging" necessarily limit those terms to overnight accommodation. For example, the first definition of "lodge," on which defendant relies, includes "to provide *temporary* quarters for" (emphasis added) and "show hospitality to," neither of which associates the meaning of the term with sleeping or staying overnight. Ultimately, the dictionary definitions are of limited assistance here, arguably supporting both parties' conflicting interpretations.

According to defendant, the city council's inclusion of the phrase "whether or not for compensation" demonstrates that the city council understood the provision of lodging to "constitute a situation where payment for 'lodging' would normally be appropriate" and that "the provision of overnight accommodations typically warrants payment, while the provision of short term shelter or services would not." Although defendant may be correct, his interpretation is not the only reasonable one. Thus, that text is likewise not particularly illuminating.

---

[5] According to the "explanatory notes" at the front of *Webster's*, "*vt*" refers to a transitive verb, which takes a direct object, and "*vi*" refers to an intransitive verb.

The context of the provision cuts against defendant's argument, however. PCC 14.130.010 (1999), which governed short-term motel rental and was included in the same title of the code, "Public Peace, Safety and Morals," included the following definitions:

"E. **Motel** - any structure, or portion of any structure, which is occupied or intended or designed for dwelling, lodging, or sleeping purposes * * *

"F. **Occupancy** - the use or possession, or the right to the use or possession, for lodging or sleeping purposes of any room or rooms in a motel."

By listing separately the terms "lodging" and "sleeping purposes," those definitions demonstrate that the city council considered "lodging" to relate to activities other than just sleeping. Otherwise, it need not have included both terms. Those definitions illustrate that the council knew how to specify sleeping when it so desired and the fact that *former* PCC 14.28.070 includes no reference to sleeping supports the inference that the council did not intend to limit that provision to require sleeping or staying overnight. *See also* PCC 16.90.145 (1999) (defining "hotel" for purposes of Title 16 "Vehicles and Traffic" as "[a]ny structure intended or designed for transient occupancy and which offers more than 25 percent of its rooms for *dwelling, lodging or sleeping purposes* for less than a 30 day period") (emphasis added); PCC 29.10.020 (1999) (defining "hotel" for purposes of Title 29 "Property Maintenance Regulations" to include a structure intended or used for "renting or hiring out for sleeping purposes by residents on a daily, weekly, or monthly basis").

Even if defendant were correct that "lodging" refers only to an overnight stay, we agree with the state that it was not required to prove that defendant's stepdaughter actually stayed overnight in order to establish that defendant harbored a runaway. Rather, *former* PCC 14.28.070 criminalizes the *provision* of lodging to a runaway, not the conduct of a runaway actually lodging—or, as defendant contends, staying overnight—in a person's home. Nothing in the dictionary definitions of "provide" as "equip" or "to supply for use" suggests that the verb requires the recipient actually to use the thing that is being provided. Thus, it was enough for the state

to establish that defendant provided his stepdaughter a place to stay overnight.

We conclude that the state presented sufficient evidence that defendant provided lodging to his stepdaughter. The evidence reflects that the stepdaughter informed Hughes that she would not return to her residential facility; that police saw her sitting in the living room of defendant's home; that defendant initially refused to allow police to enter his home to assume custody of her; and that the plan was to return her the next morning. That is sufficient evidence that defendant made his home available to his stepdaughter for overnight accommodation. Thus, even if "lodging" refers to overnight accommodation, the state has offered sufficient proof from which a jury could find that defendant *provided* lodging here and, thus, harbored a runaway. We therefore conclude that the trial court did not err in failing to grant defendant's motion for judgment of acquittal on that charge.

Affirmed.